**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANDREW E. BRADSHAW,<br><br>    Plaintiff,<br><br>    v.<br><br>OFFICE OF THE ARCHITECT OF THE<br>CAPITOL,<br><br>    Defendant. | Civil Action No. 11-cv-00536 (BAH)<br>Judge Beryl A. Howell |

<u>**MEMORANDUM OPINION**</u>

  Plaintiff Andrew E. Bradshaw filed a 24-count Complaint alleging that the defendant Office of the Architect of the Capitol, his former employer, violated the Congressional Accountability Act ("CAA"), 2 U.S.C. § 1301, *et. seq.* as well as prohibitions against employment discrimination and retaliatory employment practices through interference with plaintiff's application for disability retirement, constructive discharge of the plaintiff from his employment, and creation of a hostile work environment.  *See* Complaint ("Compl."), ECF No. 1, ¶¶ 1, 2, 3.  Pending before the Court is the defendant's Motion to Dismiss.  ECF No. 4.  The defendant seeks to dismiss 18 counts of the plaintiff's Complaint pursuant to Federal Rule of Civil Procedure Rule 12(b)(1) for lack of subject matter jurisdiction, due to the plaintiff's failure to seek counseling within 180 days after the alleged violation, or his knowledge of the alleged violation, as required by 2 U.S.C. § 1402(a).  The defendant also seeks to dismiss 12 counts of the Complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted, or in the alternative, summary judgment.  For the reasons explained below, this Court dismisses 12 counts of the plaintiff's Complaint under Rule 12(b)(1) (Counts 1, 2, 3, 7, 9, 10, 11,

15, 17, 18, 19, and 23), and the remaining 12 counts of the Complaint under Rule 12(b)(6)

(Counts 4, 5, 6, 8, 12, 13, 14, 16, 20, 21, 22, and 24).  Since the Court dismisses all 24 counts of

the plaintiff's Complaint, the plaintiff's case is dismissed.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

The plaintiff is a former employee in the Labor Division of the Office of the Architect of

the Capitol.  Compl. ¶ 9.  He asserts that he is an AFSCME Local 626 dues-paying union

member and is considered a "covered employee."  *Id*. ¶ 4.  The plaintiff was employed in the

Labor Division from May 5, 2003 until 2008 when he was separated from employment pursuant

to a Settlement Agreement with the defendant.  *Id*. ¶¶ 9, 44, 45.  The plaintiff notes that

throughout his employment with the defendant, the defendant knew of "[p]laintiff's physical

impairments of the major life activities of eating, sleeping, walking, seeing and concentrating

pursuant to the qualified ADA [Americans with Disabilities Act] disabilities of diabetes, sleep

apnea, hypertension, chronic knee problems, morbid obesity, depression, seeing, and substance

abuse."  *Id*. ¶ 13.  According to the plaintiff, defendant "regarded the [p]laintiff as disabled"

throughout his employment because of the aforementioned physical limitations.  *Id*. ¶ 14.

In 2007, the plaintiff's supervisor proposed that the plaintiff be removed from his

employment because of the plaintiff's "failure to follow leave procedures, absences without

authorized leave . . . , inappropriate behavior, sleeping during duty hours, disappearance during

duty hours and failure to follow the direct order of a supervisor."  *Id*. ¶ 22; *see also*

Plaintiff's/Applicant's Statement of Disability, ECF No. 4-4, at 5, question 6 ("As a result of my

sleep apnea and alcoholism, I had difficulty staying awake, being on time and attending my job

regularly which impacted my ability to perform duties with other staff members, and affected my

work relationship with my supervisors."); *id*. at 5, question 5 ("My sleep apnea has affected my

ability to remain awake and alert on the job and as a result, I was prevented from operating forklifts and other machinery"); *id.* ("My knee problem also reduced my mobility which made it difficult for me to perform tasks that required a great deal of walking or physical exertion.").

This lawsuit concerns the plaintiff's application for disability retirement benefits following his separation from employment.  After the plaintiff submitted his application for disability retirement benefits on December 31, 2008, he was initially denied benefits on January 25, 2010.  The plaintiff was ultimately awarded disability retirement benefits as of February 10, 2011.  Nevertheless, he initiated this lawsuit on March 14, 2011, claiming that the January 25, 2010 letter from the Office of Personnel Management ("OPM") denying his disability retirement application provided the plaintiff notice that the defendant had engaged in unlawful discriminatory and retaliatory employment practices, which resulted in the initial delay or denial of his disability retirement benefits and had the effect of "depriv[ing] the Plaintiff of equal employment opportunities, terms, conditions and benefits of employment and otherwise adversely affect[ing] his status as an employee."  Compl. ¶ 215.  The plaintiff also claims that he was "terminated" from his employment improperly, which resulted in delaying his last compensation from his employer and the wrongful termination of his health benefits and insurance in February, 2009.  *See* Declaration of Andrew E. Bradshaw ("Bradshaw Decl."), ECF No. 8-1, ¶¶ 92-96.  This meant that, for a two year period, from February 2009 through February 2011, the plaintiff had "no medical insurance or benefits to cover treatment of the now exacerbated diagnosed medical conditions."  *Id.* ¶ 96.  The plaintiff brought this suit seeking $600,000.00 in "compensatory damages and damages consistent with the [CAA]," as well as attorneys' fees, to be made "whole for all earnings and benefits he would have received but for

Defendant's unlawful and prohibited discriminatory and retaliatory employment practices," *see* Compl. at 46-47 (Prayer for Relief, at ¶¶ 3-5).

**A.  Plaintiff's Separation from Employment**

On November 9, 2007, Herbert Francis, General Foreman of the Labor Division of the U.S. Capitol Buildings, "proposed the removal of the Plaintiff from his employment . . . for failure to follow leave procedures, absences without authorized leave (AWOL), inappropriate behavior, sleeping during duty hours, disappearance during duty hours and failure to follow the direct order of a supervisor." *Id.* ¶ 22.  The plaintiff states that he "timely submitted a response" to the proposal to remove him from employment. *Id.* ¶ 23.  On February 13, 2008, Carlos Elias, Superintendent of the U.S. Capitol Buildings, "concurred" in the proposal to remove the plaintiff from employment. *Id.* ¶ 24.  The plaintiff requested "a due process hearing pursuant to Chapter 752" of the Architect of the Capitol Personnel Manual, *id.* ¶¶ 22, 25, which was scheduled for May 8, 2008.[1]

On the date of the hearing, the parties entered into a Settlement Agreement "in lieu of a formal hearing." *Id.* ¶ 27.  The Settlement Agreement provided for the "irrevocable resignation of the [p]laintiff," *see id.* ¶ 28, and included, *inter alia*, the following terms:[2]

- "Mr. Bradshaw will work with the Employee Benefits and Services Branch, HRMD, to submit an application for disability retirement by May 23, 2008, with a permissible 'grace period' of 7 days in the event of any delay obtaining medical documents."

---

[1] Sometime in the spring of 2008, the plaintiff, through his union representative, Wally Reed, requested leave for the plaintiff to enter a residential facility for 30 days for treatment for substance abuse. Compl. ¶ 16.  The defendant granted the leave request, and the plaintiff entered Hope House, a residential treatment program, for the period between March 3, 2008 and April 4, 2008.  The plaintiff "successfully completed the supervised rehabilitation program" before the date of the hearing. Compl. ¶¶ 19-20.  The plaintiff details these events in his Complaint before he details the proposed removal of the plaintiff from employment. *See id.* ¶¶ 20, 22.  The proposed removal of the plaintiff, however, took place in 2007, well before the plaintiff entered the residential treatment facility the following year.

[2] These terms are excerpted from the Settlement Agreement attached as an exhibit to the defendant's Motion to Dismiss. *See* ECF No. 4-2.

- "Mr. Bradshaw will be carried in a paid administrative leave status until August 8, 2008."

- "Mr. Bradshaw will be carried in a LWOP [Leave without Pay] status after using his own leave accruals for up to six (6) months or on the date a decision is received from the Office of Personnel Management (OPM) concerning his disability retirement application, whichever comes first."

- "Mr. Bradshaw hereby submits his irrevocable resignation effective at the end of the LWOP period or on the date a decision is received from OPM concerning his disability retirement application, whichever comes first (*This flexibility is provided based on the understanding that OPM is presently backlogged at 6-8 months)."

- "Mr. Bradshaw will not return to the Capitol Building work site for any reason after today."

- "In the event of Mr. Bradshaw's breach of this agreement, this agreement will be void and the termination action will be effective immediately without a right to a case review by a Hearing Officer, or a formal hearing before a Hearing Officer, including any grievances under the Collective Bargaining Agreement as of July 10, 2007, and a permanent record of the discipline action shall be placed in his Official Personnel Folder (OPF)."

- "By signature of this agreement, AFSCME Local 626, and Andrew Bradshaw withdraw and forgo all actions that could be filed against the AOC or its officials regarding the proposed termination, including any grievances under the Collective Bargaining Agreement of July 10, 2007."

- "Successful completion of this agreement constitutes that no more than Mr. Bradshaw's resignation will be included in his Official Personnel File (OPF)."

On June 20, 2008, Stephen Ayers, the then Acting Director of the Capitol, informed the plaintiff in a letter that the Security Agreement "as presented and agreed to by all signatories during the formal hearing held on May 8, 2008, shall be effected as written." Compl. ¶ 44.

### B. Plaintiff's Disability Retirement Application and Appeals

Although the Settlement Agreement stipulated that the plaintiff would submit his disability retirement application by May 23, 2008, with a seven day grace period to account for delays in obtaining medical records, his mother, June Henderson, acting on the plaintiff's behalf,

did not submit his application until December 31, 2008.  *Id.* ¶ 47; Bradshaw Decl. ¶¶ 49-51.[3]

The application was not complete when the plaintiff submitted it, however, because his

supervisor (Supervisor James Barber) had not yet provided the required "Supervisor's

Statement."  The plaintiff alleges that he had "made timely and numerous requests for the

statement of Plaintiff's second line supervisor James Barber to be submitted with his application

for disability retirement," *see* Compl. ¶ 46; Pl.'s Decl. ¶¶ 41-42, but to no avail.

      After the plaintiff submitted his application, Chief Vento, Chief of the Employee Benefits

and Services Branch of the Human Resources Management Division of the Office of the

Architect of the Capitol, advised the plaintiff's mother that the plaintiff's disability retirement

application would be submitted to OPM in the first week of January 2009.  Compl. ¶ 48.  The

plaintiff alleges that he and his mother met with Chief Vento in her office in late January or early

February to inquire about the status of the application, and Chief Vento assured them "that she

had submitted the application."  *Id.* ¶¶ 49-50.  The plaintiff and his mother again met with Chief

Vento during March 2009 to inquire about the status of his application because he had not yet

heard anything.  *Id.* ¶ 51.  After speaking with "an unidentified person" on the phone to inquire

about the status of the plaintiff's application, Chief Vento told the plaintiff that "the application

had been received."  *Id.* ¶ 52.

      It was not until April 2009 when the plaintiff and his mother again met with Chief Vento

to inquire about the status of the plaintiff's application that Chief Vento informed the plaintiff

that his application had been "held up" in the National Finance Center ("NFC") "because the

[p]laintiff had not been totally severed from his position due to the agency owing a small check

to the [p]laintiff."  *Id.* ¶ 55.  Chief Vento explained that "after the agency cut the [p]laintiff a

---

[3] The parties do not suggest that this late-filing on the part of the plaintiff was a breach of the Settlement Agreement so the Court will not consider that issue either.

check the NFC would continue to process" his application.  *Id.* ¶ 56.  In May 2009, the plaintiff had still not heard anything about the status of his application.  At that time, Chief Vento allegedly reiterated that the plaintiff's application was being "held up" until the agency processed a check owed to the plaintiff.  *Id.* ¶ 58.  In May 2009, the plaintiff and his mother authorized Chief Vento to speak to the NFC and OPM on his behalf about the status of his application.  *Id.* ¶ 59.

In June or July 2009, the plaintiff and his mother spoke with Margaret Newton, a retirement specialist in the Employee Benefits and Service Branch of the Human Resources Management Division of the Office of the Architect of the Capitol.  *Id.* ¶ 60.  Newton allegedly informed the plaintiff at that time that his application had not yet been processed by the NFC, and that the application "was still sitting in the NFC office as they did not know what to do with the application" because the plaintiff was terminated from employment on February 9, 2009 as a "resignation," and "not a disability retirement."  *Id.* ¶¶ 61-62.  The plaintiff also states that he learned at that time that "the application was not recorded as being received in the NFC until February 27, 2009, approximately two months subsequent to the time Chief Vento was to [have submitted] the application in early January, 2009."  *Id.* ¶ 63.  It was not until July 16, 2009, almost eight months after the plaintiff submitted his application, that OPM received the application.  *Id.* ¶ 64.

Five months later, when it appears that the plaintiff still knew nothing about the status of his application, the plaintiff contacted Congressman Steny Hoyer to request assistance "respecting the processing of his application for disability retirement, the discontinuation of his health benefits and insurance and other benefits 'lost' during the alleged processing of his application for disability retirement."  *Id.* ¶ 65.  Following Congressman Hoyer's request to

officials in the Office of the Architect of the Capitol, the plaintiff was informed by the OPM, on

January 25, 2010, that his application for disability retirement had been denied. *Id.* ¶¶ 66-67.

The plaintiff alleges that it was in the January 25, 2010 OPM denial letter ("OPM

Letter") that he "first learned that James Barber, [p]laintiff's second line supervisor, documented

that [p]laintiff had a service deficiency of unacceptable attendance"  and that "the medical

documents regarding [p]laintiff's restrictions 'did not show that the service deficiency described

by [Barber] was as a result of a disabling medical condition that precluded the performance of

[plaintiff's] essential duties or medically warranted [plaintiff's] continued absence [from] the

workplace." *Id.* ¶ 68.[4]

On February 17, 2010, Congressman Hoyer's office provided the plaintiff a February 4,

2010 letter from Stephen Ayers, then Acting Architect of the Capitol, written in response to the

Congressman's inquiry.  Ayers noted in the letter that the plaintiff's application package "was

processed and forwarded to the [NFC] on February 27, 2009." *Id.* ¶ 70.  Ayers also stated that

"due to an administrative letter by AOC, Mr . Bradshaw's voluntary resignation was processed

before his application for disability retirement was adjudicated by [OPM]." *Id.* ¶ 71.  "[T]his

discrepancy," according to Ayers, "caused a delay in processing at NFC.  As a result, OPM did

not receive Mr. Bradshaw's application from NFC until September 16, 2009." *Id.* ¶ 72.

"[W]hile AOC endeavored to resolve this matter with both NFC and OPM," Ayers stated, "the

---

[4] The plaintiff provides the following summary of the information provided by Supervisor Barber in the
Supervisor's Statement: "The information provided by Barber appears in Section C.  Information about Employee's
Attendance.  (Supervisor's Statement p.2).  In response to the question 'Is employee's attendance unacceptable for
continuing in current position?', the available responses were 'No' or 'yes, attendance stopped or became
unacceptable.'  *Id.*  The latter response was checked off.  Block 3 also asked 'Explain the impact of employee's
absence on [your] work operations.'  The response is 'HRMD and management met with Mr. Bradshaw 5/8/08 to
settle this matter.  (Supervisor's Statement).'"  Pl.'s Opp. to Def.'s Statement of Material Facts Not in Genuine
Dispute, ECF No. 8, ¶ 14.  The Supervisor's Statement also includes the following question: "6.  Identify any critical
element(s) of the position which employee does not perform successfully or at all.  Explain the deficiencies you
observed.  Attach supporting documentation such as notice to . . . employee that performance is less than fully
[successful] or physician's recommendation regarding medical restrictions." ECF No. 4-3 at 2.  Supervisor Barber
responded "All Documents are attached (medical) Regarding Restriction etc." *Id.*

issues involved precluded the timely handling of Mr. Bradshaw's application." *Id*. ¶ 73. Ayers also allegedly noted (apparently incorrectly) that "to date, OPM has not rendered a decision on Mr. Bradshaw's disability retirement application. Discussions with OPM revealed that the case is under review and a final determination should be issued in the coming weeks." *Id*. ¶ 74.

On March 18, 2010, the plaintiff submitted a Motion for Reconsideration of OPM's decision. He was alerted of OPM's "final decision" on July 19, 2010, which upheld the OPM denial of his application. *Id*. ¶¶ 76-77. The plaintiff then hired a lawyer and appealed the OPM denial to the Merit Systems Protection Board. These appeals culminated on February 10, 2011, when, over two years after submitting his application, the plaintiff was informed that his application for disability retirement was approved. *Id*. ¶ 80.

The plaintiff claims that he made a Request for Counseling in the Office of Compliance on July 16, 2010. The plaintiff alleges that the request was made based on the defendant's "interference with [p]laintiff's application for disability retirement, constructive discharge of the [p]laintiff from his employment with defendant and creation of a hostile work environment." *Id*. ¶ 1. The plaintiff states that he also "timely requested and participated in mediation pursuant to 2 U.S.C. § 1403 of the CAA." Pl.'s Mem. in Opp. to Def.'s Mot. to Dismiss ("Pl.'s Mem.") at 13.

The plaintiff then filed his 24-count Complaint in U.S. District Court for the District of Columbia on March 14, 2011. ECF No. 1. The 24 counts of the plaintiff's Complaint are detailed in the discussion section below.

On August 27, 2011, the defendant moved to dismiss eighteen counts of the plaintiff's Complaint (Counts 1, 2, 3, 6, 7, 8, 9, 10, 11, 14, 15, 16, 17, 18, 19, 22, 23, 24) pursuant to Federal Rule of Civil Procedure Rule 12(b)(1) for lack of subject matter jurisdiction, due to the plaintiff's failure to seek counseling within 180 days after the alleged violation, or his knowledge

of the alleged violation, as required by 2 U.S.C. § 1402(a).  The defendant moved to dismiss

twelve counts of the Complaint (Counts 4, 5, 6, 8, 12, 13, 14, 16, 20, 21, 22, 24) pursuant to Rule

12(b)(6) for failure to state a claim upon which relief can be granted, or in the alternative,

summary judgment.

## II.    STANDARD OF REVIEW

### A.    Motion to Dismiss

On a motion to dismiss for lack of subject matter jurisdiction, under Rule 12(b)(1) of the

Federal Rules of Civil Procedure, the plaintiff bears the burden of establishing jurisdiction by a

preponderance of the evidence.  *Mostofi v. Napolitano*, No. 11-0727, 2012 U.S. Dist. LEXIS

9563, at *4 (D.D.C. Jan. 27, 2012) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561

(1992)); *Ki Sun Kim v. United States*, No. 08-01660, 2012 U.S. Dist. LEXIS 2094, at *8 (D.D.C.

Jan. 9, 2012); *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002).  As the

Supreme Court has explained "many times," the "district courts of the United States . . . are

'courts of limited jurisdiction.  They possess only that power authorized by Constitution and

statute.'"  *Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 552 (2005) (quoting *Kokkonen

v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994)) (internal citations omitted); *see

also Micei Int'l v. DOC*, 613 F.3d 1147, 1151 (D.C. Cir. 2010) ("[T]wo things are necessary to

create jurisdiction in an Article III tribunal other than the Supreme Court . . . The Constitution

must have given to the court the capacity to take it, *and an act of Congress must have supplied

it*.") (internal citations and quotation marks omitted).  For this reason, a "federal district court's

initial obligation is to ascertain its subject matter jurisdiction."  *Malyutin v. Rice*, 677 F. Supp. 2d

43, 45 (D.D.C. 2009), *aff'd*, No. 10-5015, 2010 U.S. App. LEXIS 13869 (D.C. Cir. July 6,

2010).  When a court lacks subject matter jurisdiction, it must dismiss the case.  *See Ravulapalli*

*v. Napolitano*, 773 F. Supp. 2d 41, 48 (D.D.C. 2011); *McManus v. District of Columbia*, 530 F.

Supp. 2d 46, 62 (D.D.C. 2007).

In evaluating whether a complaint sufficiently states a claim for relief to withstand a

motion to dismiss under Federal Rule of Procedure 12(b)(6), the court must first ascertain

whether the complaint contains "a short and plain statement of the claim showing that the

pleader is entitled to relief," as well as grounds for the court's jurisdiction and the specific relief

sought.  FED. R. CIV. P. (8)(a).  While "'detailed factual allegations'" are not required, the

complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon

which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation and

quotation marks omitted); *see also Ciralsky v. CIA*, 355 F.3d 661, 668-71 (D.C. Cir. 2004).  In

assessing whether a complaint is sufficient, the "court 'construes the complaint liberally in the

plaintiff's favor,' 'accept[ing] as true all of the factual allegations contained in the complaint.'"

*Aktieselskabet AF 21. November 2001 v. Fame Jeans*, 525 F.3d 8, 15 (D.C. Cir. 2008) (citing

*Kessem v. Wash. Hosp. Ctr.*, 513 F.3d 251 (D.C. Cir. 2008) and *Stewart v. Nat'l Educ. Ass'n*,

471 F.3d 169, 173 (D.C. Cir. 2006)); *see also Atherton v. District of Columbia Office of the*

*Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009).

### B.      Exhaustion Requirement under the Congressional Accountability Act

The plaintiff brings this lawsuit under the Congressional Accountability Act ("CAA"), 2

U.S.C. § 1317, in which the United States has provided a limited waiver of the legislative

branch's sovereign immunity.  Section 1408 of the CAA states, in relevant part:

> The district courts of the United States shall have jurisdiction over any civil action
> commenced under section 1404 of this title and this section by a covered
> employee who has completed counseling under section 1402 and mediation under
> section 1403 of this title.  A civil action may be commenced by a covered
> employee only to seek redress for a violation for which the employee has
> completed counseling and mediation.

2 U.S.C. § 1408(a).

In the CAA, "Congress specified a three-step process that requires counseling and mediation before an employee may file a complaint seeking administrative or judicial relief." *Blackmon-Malloy v. United States Capitol Police Bd.*, 575 F.3d 699, 701 (D.C. Cir. 2009).  The CAA mandates that the "request for counseling . . . be made not later than 180 days after the date of the alleged violation."  2 U.S.C. § 1402; *see also Thompson v. Capitol Police Bd.*, 120 F. Supp. 2d 78, 82 (D.D.C. 2000) (finding that the court lacked subject matter jurisdiction where plaintiff requested counseling more than 180 days after the alleged violation).  If a party does not satisfy these requirements, there is no judicial remedy.  2 U.S.C. § 1410 ("Except as expressly authorized by sections 1407, 1408, and 1409 . . .  the compliance or noncompliance with the provisions of this Chapter and any action taken pursuant to this Chapter shall not be subject to judicial review.").

As the plaintiff concedes, "[l]odging a timely administrative charge is a prerequisite to filing a Title VII claim in federal court."  Pl.'s Mem at 13 (citing *Jarrell v. U.S. Postal Serv.*, 753 F.2d 1088, 1091 (D.C. Cir. 1985)).  Unlike in Title VII actions, however, the administrative or exhaustion requirements under the CAA are jurisdictional prerequisites.  *See Blackmon-Malloy*, 575 F.3d at 702 (holding that the three-step process is jurisdictional and affirming the district court's ruling that "equitable doctrines . . . do not apply to excuse compliance with it").

## III.   DISCUSSION

The plaintiff's 24-count Complaint includes allegations based on 8 allegedly adverse acts of the defendant, namely: (1) the "refusal by defendant to timely produce Supervisor Barber's statement to be submitted with plaintiff's application for disability retirement," Compl. at 13, 23, 33-34 (Counts 1, 9, 17); (2) the "refusal by defendant to provide the plaintiff with a copy of the

statement of Supervisor Barber to be submitted with plaintiff's application for disability retirement," Compl. at 14, 24, 35 (Counts 2, 10, 18); (3) "Chief Vento's multiple misrepresentations respecting the dates when she submitted plaintiff's application for disability retirement," Compl. at 15, 16, 26, 37 (Counts 3, 11, 19); (4) "Acting Architect Ayers' misrepresentations to Congressman Hoyer respecting the 'oversight' and delay in submitting plaintiff's application for disability retirement," Compl. at 16, 27, 38 (Counts 4, 12, 20); (5) "Defendant's breach of section 9 of the May 8, 2008 Agreement by way of the statement of Supervisor Barber submitted with plaintiff's application for disability retirement," Compl. at 18, 28, 40 (Counts 5, 13, 21); (6) "Constructive Discharge of the Plaintiff from employment," Compl. at 19, 29, 41 (Counts 6, 14, 22); (7) "Deprivation of Plaintiff's entitlement and right of redress to a due process Chapter 752 formal hearing on the November 7, 2007 proposal to remove the plaintiff from his employment with defendant," Compl. at 20, 31, 43 (Count 7, 15, 23); and (8) "Creation of a supervisory hostile work environment," Compl. at 22, 32, 45 (Count 8, 16, 24).

　　　Each of these eight allegedly adverse acts forms the basis for the plaintiff's claims of discrimination and retaliation based on his status as disabled under the ADA and his participation in protected FMLA and union activities.  Specifically, in the first eight Counts of the Complaint, the plaintiff alleges "unlawful discrimination based on Plaintiff's medical record and Defendant's regard of Plaintiff as disabled pursuant to the [ADA]."  Pl.'s Mem. at 1; *see also* Compl. at 13-22.  In the second eight Counts, the plaintiff alleges "unlawful retaliation in violation of [2 U.S.C. § 1317(a) of the CAA] based on Plaintiff's participation in federal protected activities pursuant to the [FMLA]."  Pl.'s Mem. at 1-2; *see also* Compl. at 23-32.  The third and final eight Counts allege "unlawful retaliation based on Plaintiff's participation in

federal protected activities pursuant to and based on Plaintiffs's dues paying membership in AFSCME Local 626 and use of services of AFSCME Local 626 pursuant to [2 U.S.C. § 1351] of the CAA."  Pl.'s Mem. at 2; *see also* Compl. at 33-45.

The Court concludes that 12 of the counts should be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction and the remaining 12 of the counts should be dismissed under Rule 12(b)(6).  The grounds for dismissal are addressed seriatim below.

**A.  Counts Dismissed under Rule 12(b)(1)**

The defendant first argues that the Court is without subject matter jurisdiction to address many of the plaintiff's claims because those claims allege distinct adverse actions that took place more than 180 days before the plaintiff sought counseling as required in order to bring a claim under the CAA.  The plaintiff alleges that he sought counseling on July 16, 2010.  Compl. ¶¶ 1-3. Therefore, the defendant argues that any events accruing before January 17, 2010, 180 days before July 16, 2010, should be dismissed for lack of subject matter jurisdiction.  The Court first addresses the plaintiff's general arguments against dismissal under Rule 12(b)(1) and then turns to the underlying claims in Counts 1, 2, 3, 7, 9, 10, 11, 15, 17, 18, 19, and 23, all of which the Court dismisses under Rule 12(b)(1).

**1.       Plaintiff's Arguments Against Dismissal under Rule 12(b)(1) are Unavailing**

The Court first turns to plaintiff's numerous interrelated arguments against dismissal under Rule 12(b)(1).  Essentially, the plaintiff contends that, for purposes of the limitations period, he did not become aware that the defendant's actions were "adverse actions" until he received the January 25, 2010 OPM letter ("OPM Letter") denying his application for disability benefits.  Pl.'s Mem. at 14.  The plaintiff claims that OPM denied his application "based on the 'Supervisor's Statement' submitted with Plaintiff's application for disability retirement[,]

14

documentation which Defendant in violation of the law has not provided the Plaintiff." *Id.*  It

was only upon receiving the OPM Letter, which he interprets as basing the denial of his

application on the "Supervisor's Statement," that the plaintiff says he realized that all of the

earlier actions of the defendants (the untimely production of the Supervisor's Statement, the

refusal to show plaintiff the Supervisor's Statement, Chief Vento's alleged misrepresentations,

Architect Ayer's alleged misrepresentations, etc.) were "adverse actions."   Pl.'s Mem. at 14; *see*

*also* Bradshaw Decl. ¶¶ 85-90.  Similarly, the plaintiff argues that prior to receiving the OPM

Letter, he "had no notice or knowledge that Defendant created a supervisory hostile work

environment" and that "the creation of the supervisory hostile environment was an 'adverse

action.'"  *Id.* at ¶ 98.

The plaintiff makes a number of arguments to support the proposition that his seeking

counseling within 180 days after receiving the OPM Letter constitutes a timely request for

counseling.  The plaintiff principally relies on *Delaware State College v. Ricks*, 449 U.S. 250,

258 (1980), to support his contention that the statute of limitations for seeking counseling began

running when he received the January 25, 2010 OPM denial letter, and not before.  In *Ricks*, the

Supreme Court stated that "the only alleged discrimination occurred — and the filing limitations

periods therefore commenced — at the time the tenure decision was made and communicated to

Ricks."  449 U.S. at 258.  The plaintiff further points to numerous decisions relying on *Ricks* that

similarly state that the limitations period is triggered when the plaintiff learns of an adverse

action.  *See, e.g.*, *Belt v. United States Department of Labor*, Nos. 04-3487, 04-3926, 2006 WL

197385, at *4 (6th Cir. 2006) ("A plaintiff's cause of action accrues when he receives notice of

termination, not when his employment actually ceases."); *Flaherty v. Metromail Corp.*, 235 F.3d

133, 137 (2d Cir. 2000) (noting that it "has long been settled that a claim of employment

discrimination accrues for statute of limitation purposes on the date the employee learns of the

employer's discriminatory conduct."); *Farrell v. Bank of New Hampshire-Portsmouth*, 929 F.2d

871, 874 (1st Cir. 1991) ("Were the triggering act . . . uncommunicated to anyone else, it is hard

to see any legal consequences attending the [adverse decision].  It remains solely within the

power of the decider to revoke, to alter, or even not to reveal the decision for the limitations

period.").  The defendant does not disagree that time starts tolling when the adverse acts are

communicated to a party, but argues that the adverse actions underlying the plaintiff's claims

were communicated to him well before the January 25, 2010 letter.   Def.'s Reply at 7.

In a related point, since the plaintiff argues that he was unaware that the defendant's

actions were adverse until he received the OPM Letter, the plaintiff contends that the "discrete

'adverse actions,' though discrete," Pl.'s Mem. at 15, should not be looked at individually.

Rather, the plaintiff argues that the Complaint must be viewed as a "unique entity," *id*. at 14, and

"a unique undivided integrated whole."  *Id*. at 15.  "The Complaint," the plaintiff states,

"refracted through the prism of said January 25, 2010 letter of the OPM, is the sum of its parts.

To allow fragmentation is to [provide] an escape from responsibility."  *Id*.  Similarly, the

plaintiff argues that "Defendant's reliance on linear time is misplaced."  *Id*.  The plaintiff argues

that, reminiscent of the movie Citizen Kane (a film "told in flashback") or a mystery novel, "the

significance of the 'adverse actions' alleged as 'adverse actions' and unlawful discriminatory and

retaliatory employment practices set forth [in the counts defendant seeks to have dismissed under

Rule 12(b)(1)] cannot be identified as 'adverse actions' until receipt by Plaintiff of the January

25, 2010 letter of the OPM containing the 'Supervisor's Statement' that Defendant denied the

Plaintiff and was the basis for denying Plaintiff his application for disability retirement by the

OPM." *Id*. at 17.  It is only at that time, plaintiff argues, that he realized that all of the earlier

acts were adverse actions culminating in the denial of his disability retirement.

The plaintiff's argument is unavailing, however, for several reasons.  First, the alleged

adverse action of January 25, 2010 was a decision by the OPM, and not even a decision or action

by the defendant.  The plaintiff has not stated a plausible claim that a decision by a non-party to

this action denying the plaintiff disability retirement benefits transformed the defendant's earlier

actions into "adverse actions."  Second, by the time the plaintiff received the OPM Letter, he was

already aware that he had not seen the Supervisor's Statement, that Chief Vento had allegedly

misrepresented when his application was filed, and that he had decided to take part in a

Settlement Agreement rather than a due process hearing.

Third, to the extent that the plaintiff is alleging that his OPM denial of disability benefits

was because of the content of the Supervisor's Statement, the plaintiff has not stated a plausible

claim.  To the contrary, as the defendant indicates, a review of the OPM Letter shows that the

adverse decision was based, not on anything stated in the Supervisor's Statement, but on the

insufficiency of the medical documentation in the plaintiff's application.  *See* OPM

Determination Letter, ECF No. 8-3, at 6 ("In summary, the medical evidence in file did not

establish that you had disabling medical conditions/symptoms.  There was insufficient medical

documentation to demonstrate the severity of your symptoms.  We cannot determine that your

symptoms resulted in a disability.  Based on information in file, the medical condition did not

appear to be serious, severe, or disabling . . . Therefore, we have disallowed your application for

disability retirement.").  The plaintiff stated in his Complaint that he provided medical

documentation in his application.  *See* Compl. ¶ 47 ("On December 31, 2008, Plaintiff . . .

timely provided Ms. Vento . . . with the forms and medical documentation he was required to

provide in necessary support of his application for disability retirement . . . .").  While the plaintiff suggests that "medical evidence" was "submitted [by the Supervisor's Statement]," Pl.'s Mem. at 15, the Supervisor's Statement and the rest of the Complaint do not offer support for this unsubstantiated allegation.  To the contrary, the Complaint states clearly that the plaintiff had the opportunity to submit medical evidence to support his application for disability retirement benefits.  Compl. ¶ 47.  From the plain reading of the OPM denial letter, the plaintiff was denied benefits because the medical evidence was not sufficient to "demonstrate the severity of [his] symptoms."  OPM Determination Letter, ECF No. 8-3, at 6.  Accordingly, the plaintiff has alleged no plausible allegation to support the running of the limitations period from the time he received the denial letter from the OPM, an entity not even a party to this action.[5]

The plaintiff also argues unavailingly that the federal "discovery rule" should apply in this case.  Pl.'s Mem. at 22-25.  The plaintiff alleges that he "did not discover that Supervisor Barber and Defendant, in violation of the 'Instructions' contained in the 'Supervisor's statement' submitted by Defendant with Plaintiff's application for disability retirement, did not provide the Plaintiff with a copy of the 'Supervisor's Statement' and the attachments thereto pursuant to which the OPM denied Plaintiff's application for disability retirement."  Pl.'s Mem. at 25.  This Court finds, however, that the discovery rule does not save the plaintiff's claims under the CAA, where the statute of limitations is a jurisdictional bar.  *See e.g.*, *Terry v. U.S. Small Business Admin*, 699 F. Supp. 2d 49, 54-55 (D.D.C. 2010) ("when a statute of limitations has been regarded as jurisdictional, 'it has acted as an absolute bar [that cannot] be overcome by the application of judicially recognized exceptions . . . such as waiver, estoppel, equitable tolling,

---

[5] The plaintiff also claims in his Opposition to the instant Motion that the OPM Letter "stated that Defendant 'provided information showing that [Plaintiff] had resigned' from Defendant, when in fact the Plaintiff had not resigned."  Pl.'s Mem. at 15.  The Settlement Agreement, however, provided that "Successful completion of this agreement constitutes that no more than Mr. Bradshaw's resignation will be included in his Official Personnel File (OPF)."  ECF No. 4-2.

fraudulent concealment, the discovery rule and the continuing violations doctrine."); *Keohane v. United States*, 775 F. Supp. 2d 87, 90 (D.D.C. 2011) ("[W]hen a statute of limitations has been regarded as jurisdictional, it has acted as an absolute bar that cannot be overcome by the application of judicially recognized exceptions such as waiver, estoppel, equitable tolling, fraudulent concealment, the discovery rule, and the continuing violations doctrine") (citations omitted); *Conservation Force v. Salazar*, 811 F. Supp. 2d 18, 19 (D.D.C. 2011) ("a jurisdictional statute of limitations cannot be overcome by the application of judicially recognized exceptions such as waiver, estoppel, equitable tolling, fraudulent concealment, the discovery rule, and the continuing violations doctrine.") (citations and internal quotation marks omitted).  Even if the discovery rule applied here, the plaintiff's claims would not survive the Motion to Dismiss because the plaintiff knew that Supervisor Barber had not provided him a copy of the Supervisor's Statement more than 180 days before he sought counseling, *see* Bradshaw Decl. ¶ 51; Declaration of June Henderson ("Henderson Decl.") ¶¶ 4-9, 13 (describing plaintiff's efforts to obtain the Supervisor Statement from Barber, to no avail).  Furthermore, the plaintiff has made no plausible allegation that the substance of the supervisor's letter was the reason for the denial of his benefits.

The plaintiff argues in the alternative that the plaintiff's request for counseling was timely pursuant to the doctrine of equitable tolling.  As the plaintiff himself notes, however, the D.C. Circuit, in *Blackmon-Malloy v. United States Capitol Police Board*, 575 F.3d 699 (D.C. Cir. 2009), determined that equitable doctrines may not be used to excuse compliance with the three-step process under the CAA.  *See id*. at 702 ("We hold the three-step process is jurisdictional and thus affirm the district court ruling that equitable doctrines, such as vicarious exhaustion, do not apply to excuse compliance with it."); *see also* Pl.'s Mem. at 26.  Circuit

precedent is binding on this Court, so plaintiff's arguments for application of an equitable doctrine, equitable tolling, are unavailing.

Although the plaintiff would like the Court to analyze the complaint as "an undivided integrated whole," the Court must instead analyze the plaintiff's claims individually to determine when the plaintiff learned of the allegedly adverse actions.  In doing so, the Court finds that the plaintiff knew of all of the alleged adverse actions well before he sought counseling.  The Court now turns to the underlying facts of each adverse action that must be dismissed for failure to comply with the requirements of CAA's section 1402.

### 2.     Underlying Claims in Counts 1, 2, 3, 7, 9, 10, 11, 15, 17, 18, 19, 23

The Court groups the underlying claims of the Complaint by subject matter below, first addressing the plaintiff's allegations (a) related to the "refusal by defendant to timely produce supervisor Barber's statement to be submitted with plaintiff's application for disability retirement," *see* Compl. at 13-14, 23-24, 33-35 (Counts 1, 9, 17), and "the refusal by defendant to provide the plaintiff with a copy of the statement . . .," *see* Compl. at 14-15, 24-25, 35-36 (Counts 2, 10, 18); then turning to the plaintiff's allegations regarding (b) the "defendant's interference with plaintiff's application for disability retirement," *see* Compl. at 15-16, 24-25, 36-38 (Counts 3, 11, 19); and finally addressing the plaintiff's claims related to (c) the "deprivation of plaintiff's entitlement and right of redress to a due process Chapter 752 formal hearing on the November 7, 2007 Proposal to remove the plaintiff from his employment with defendant," *see* Compl. at 20-22, 31-32, 43-44 (Counts 7, 15, and 23).  The Court concludes that all of these counts must be dismissed under Rule 12(b)(1) because the plaintiff sought counseling more than 180 days after learning of the alleged adverse actions described in these counts.  *See* 2

U.S.C. § 1402(a) ("A request for counseling shall be made not later than 180 days after the date of the alleged violation").

### (a)       Supervisor Statement Allegations (Counts 1, 9, 17; 2, 10, 18)

Counts 1, 9, and 17 and Counts 2, 10, and 18 of the plaintiff's Complaint are all allegations concerning the plaintiff's supervisor, James Barber, and the "Supervisor Statement" part of the disability retirement application.  Counts 1, 9, and 17 all focus on the alleged "refusal by defendant to timely produce supervisor Barber's statement to be submitted with plaintiff's application for disability retirement." *See* Compl. at 13-14, 23-24, 33-35.  The plaintiff alleges, for example, that the "refusal by Defendant to timely produce Supervisor Barber's statement to be submitted with Plaintiff's application for disability retirement," Compl. ¶ 82 (Count I), was an "unlawful discriminatory employment [practice]" that was (1) "based on Plaintiff['s] ADA qualified disabilities . . ." *id.*; and an "unlawful retaliatory employment [practice]," Compl. ¶ 122 (Count 9), (2) "based on Plaintiff['s] use of FMLA leave pursuant to his approved absence from the workplace to enter a thirty day residential rehabilitation treatment facility for the serious FMLA medical condition of alcoholism . . . .[,]" *id.*; and (3) "based on Plaintiff's AFSCME Local 626 union membership and use of said union's services in representing him . . . ." Compl. ¶ 170 (Count 17).

Similarly to Counts 1, 9, and 17, Counts 2, 10, and 18 all relate to allegations by the plaintiff regarding the "refusal by defendant to provide the plaintiff with a copy of the statement of supervisor Barber to be submitted with plaintiff's application for disability retirement." *See* Compl. at 14-15, 24-25, 35-36.  The plaintiff alleges that "refusal by Defendant to provide the Plaintiff with a copy of the statement of Supervisor Barber to be submitted with Plaintiff's application for disability retirement" was an "unlawful discriminatory [practice]," Compl. ¶ 87

(Count 2) that was (1) "based on Plaintiff's ADA qualified disabilities, Plaintiff's recorded medical history, [and] Defendant's regard of Plaintiff's physical impairments . . . .[,]" *id*.; and an "unlawful retaliatory employment [practice]," Compl. ¶ 128 (Count 10), that was (2) "based on Plaintiff's use of FMLA leave pursuant to his approved absence from the workplace to enter a thirty day residential rehabilitation treatment facility for the serious FMLA medical condition of alcoholism . . .[,]" *id*.; and (3) "based on Plaintiff's AFSCME Local 626 union membership and use of said union's services in representing him . . . ." Compl. ¶ 176.

The defendant argues, and the Court agrees, that the Court does not have subject matter jurisdiction to address any of these claims. When the plaintiff submitted his application on December 31, 2008, with the assistance of his mother, the plaintiff knew that the application for disability retirement did not yet include the Supervisor's Statement from Barber. *Id*. ¶ 47; Pl.'s Decl. ¶¶ 44-46. In fact, the plaintiff emphasizes that he only submitted his application after he "made timely and numerous requests for [Barber's statement] to be submitted with his application for disability retirement." Compl. ¶ 46; Pl.'s Decl. at ¶ 42. The plaintiff also states that, earlier, on October 23, 2008, he attempted to deliver a sealed envelope to Chief Vento that he thought contained the Supervisor's Statement. Pl.'s Decl. ¶¶ 43-44. "Chief Vento, on opening the sealed envelope noted, the required Supervisor's Statement was not in the envelope." *Id*. ¶ 45 (internal quotation mark omitted). Thus, the plaintiff knew by December 31, 2008, when he submitted his application for disability retirement, that the defendant had not provided the plaintiff a copy of the Supervisor's Statement.

Although the plaintiff was well aware of the missing document from Barber, the plaintiff did not seek counseling until more than a year and a half after he submitted his disability retirement application, on July 16, 2010. This Court must dismiss these allegations regarding the

22

failure to provide him with a copy of the supervisor statement for lack of subject matter jurisdiction as plaintiff knew of the missing supervisor statement more than a year before he requested counseling.  *See Gordon*, 750 F. Supp. 2d at 90 (filing limitations period begins accruing upon notice or discovery of an adverse action).

**(b) Submission of Plaintiff's Application Allegations (Counts 3, 11, 19)**

Counts 3, 11, and 19 are all allegations related to "defendant's interference with plaintiff's application for disability retirement" through Chief Vento's "multiple misrepresentations respecting the dates when she submitted plaintiff's application for disability retirement."  Compl. at 15-16, 25-26, 36-38.  The plaintiff alleges that Chief Vento's "multiple representations . . . were unlawful discriminatory employment practices," Compl. ¶ 92 (Count 3), that were (1) "based on Plaintiff's ADA qualified disabilities, Plaintiff's recorded medical history, [and] Defendant's regard of Plaintiff's physical impairments . . . [,]" *id.*; and "unlawful retaliatory employment practices," Compl. ¶ 134 (Count 11), that were (2) "based on Plaintiff's use of FMLA leave pursuant to his approved absence from the workplace to enter a thirty day residential rehabilitation treatment facility. . .[,]" *id.*; and (3) "based on Plaintiff's AFSCME Local 626 union membership and use of said union's services in representing him . . ."  Compl. ¶ 182 (Count 19).

As noted *supra*, the plaintiff has alleged that Chief Vento promised his mother in December 2008 that plaintiff's disability retirement application would be submitted the first week of January 2009.  *Id.* ¶ 48.  The plaintiff then alleges that Chief Vento offered him and his mother multiple misrepresentations about the dates on which plaintiff's application would be submitted.  *Id.* ¶¶ 47, 49-50, 51-52, 54, 57-58.  The plaintiff also alleges, however, that he learned from a retirement specialist in June or July 2009 that the plaintiff's application "was not

recorded as being received in the NFC until February 27, 2009." *Id.* ¶ 63.  Therefore, the

plaintiff knew as of June or July 2009 that the application had not been filed as Chief Vento had

allegedly promised, in the first week of January 2009.  The plaintiff, however, did not seek

counseling until nearly a year later.  The allegations about Chief Vento's alleged

misrepresentations about submission of the application must therefore be dismissed for lack of

subject matter jurisdiction because the plaintiff did not seek counseling within 180 days of

learning of Chief Vento's alleged misrepresentations.

### (c) Deprivation of Due Process Hearing Allegations (Counts 7, 15, 23)

Counts 7, 15, and 23 are all allegations related to the alleged "deprivation of plaintiff's

entitlement and right of redress to a due process Chapter 752 formal hearing on the November 7,

2007 Proposal to remove the plaintiff from his employment with defendant."  Compl. at 20-22,

31-32, 43-44.  The plaintiff alleges that this was an "unlawful discriminatory employment

[practice]," Compl. ¶ 112 (Count 7), that was (1) "based on Plaintiff's ADA qualified

disabilities, Plaintiff's recorded medical history, [and] Defendant's regard of Plaintiff's ADA

qualified disabilities . . .[,]" *id.*; and an "unlawful retaliatory employment practice[,]" Compl. ¶

158 (Count 15); (2) "based on Plaintiff's use of FMLA leave pursuant to his approved absence

from the workplace to enter a thirty day residential rehabilitation treatment facility . . .[,]" *id.*;

and (3) "based on Plaintiff's AFSCME Local 626 union membership and use of said union's

services . . . ."  Compl. ¶ 206.

As noted *supra*, pursuant to the plaintiff's request, a formal Chapter 752 hearing was

scheduled in this matter for May 8, 2008.  *Id.* ¶¶ 25-26.  The plaintiff states that, on May 8, 2008,

"the parties entered into a Settlement Agreement in lieu of a formal hearing and executed an

'Agreement Framework.'"  *Id.* ¶ 27; *see also* Pl.'s Decl. at ¶ 22 (". . . I entered into a Settlement

Agreement with the Defendant in lieu of a formal hearing . . .").  Although the plaintiff was

aware that he entered into a Settlement Agreement "in lieu of" a formal hearing on May 8, 2008,

he is now attempting to bring claims related to his deprivation of a formal hearing.  This Court

plainly lacks subject matter jurisdiction to hear these claims because the plaintiff sought

counseling nearly two years after he was aware that he was not taking part in a formal due

process hearing.  Even if the Court had subject matter jurisdiction to hear these claims, it is

unlikely that the plaintiff could state a claim for relief given that he voluntarily agreed to take

part in the Settlement Agreement "in lieu of a formal hearing."  *Id.*

**B.**     **Counts Dismissed under Rule 12(b)(6) or, in the Alternative, Summary Judgment**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S.

Ct. 1937, 1949 (2009).  The defendant argues that the remainder of plaintiff's claims may be

dismissed for failure to state a claim to relief that can possibly give rise to relief.  The Court

agrees.  The Court discusses the plaintiff's remaining claims below, grouping the counts of the

Complaint by subject matter.  The Court first addresses plaintiff's allegations related to (1) the

alleged "breach of Section 9 of the May 8, 2009 Agreement by way of the statement of

Supervisor Barber submitted with plaintiff's application for disability retirement," *see* Compl. at

18, 28, 39 (Counts 5, 13, 21).  The Court then turns to plaintiff's allegations regarding (2) the

"creation of a supervisory hostile work environment," *see* Compl. at 22-23, 32-33, 45-46 (Counts

8, 16, 24); (3) the alleged "constructive discharge of the plaintiff from employment," *see* Compl.

at 19-20, 29-31, 41-43 (Counts 6, 14, 22); and (4) allegations of "Acting Architect Ayers's

Misrepresentations to Congressman Hoyer respecting the 'oversight' and delay in submitting

plaintiff's application for disability retirement," *see* Compl. at 16-18, 27-28, 38-40 (Counts 4, 12,

20).   The Court concludes that all of these claims must be dismissed under Rule 12(b)(6) for

failure to state a claim which can "plausibly give rise to an entitlement to relief," as required by

*Iqbal*, 129 S. Ct. at 1941.

> **1.      Breach of the May 8, 2008 Settlement Agreement Allegations (Counts 5, 13, 21)**

Counts 5, 13, and 21 all concern defendant's alleged "breach of Section 9 of the May 8,

2008 Agreement by way of the statement of Supervisor Barber submitted with plaintiff's

application for disability retirement."  Compl. ¶¶ 102, 146, 194.  The plaintiff alleges that

"[t]here was a causal connection between the Plaintiff's ADA qualified disabilities, Plaintiff's

recorded medical history, [and] Defendant's regard of Plaintiff as disabled" and defendant's

alleged breach.  *Id*. ¶ 103.  The plaintiff further alleges that "Defendant's breach of Section 9 of

the May 8, 2008 Agreement by way of the statement of Supervisor Barber submitted with

Plaintiff's application for disability retirement were unlawful retaliatory employment activities

reasonably likely and designed to deter, chill and interfere with the Plaintiff's participating and

engaging in federally protected activities under the CAA."  Compl. ¶ 148.   The plaintiff also

states that the alleged breach was based on (1) "Plaintiff's ADA qualified disabilities, Plaintiff's

recorded medical history, [and] Defendant's regard of Plaintiff's physical impairments," Compl.

¶ 102; (2) "Plaintiff's use of FMLA leave pursuant to his approved absence from the workplace

to enter a thirty day residential rehabilitation treatment facility for the serious FMLA medical

condition of alcoholism . . .[,]" *id*. ¶ 146; and (3) "Plaintiff's AFSCME Local 626 union

membership and use of said union's services in representing him . . . ."  Compl. ¶ 194.

As noted *supra*, Section 9 of the May 8, 2008 agreement provided that the agreement was

"entered into on a non-precedential basis.  Signature of this agreement does not in any way

constitute an admission or error or wrong-doing by any of the Parties."  *Id.* ¶ 40.  The plaintiff

alleges in his Complaint that this section was violated by Supervisor Barber.  Compl. ¶¶ 102,

146, 194.  Specifically, he alleges that he "first learned that James Barber, Plaintiff's first-line

supervisor, documented that Plaintiff had a service deficiency of unacceptable attendance; and

that the medical documents regarding Plaintiff's restrictions 'did not show that the service

deficiency described by Mr. Barber was as a result of a disabling medical condition that

precluded the performance of your essential duties or medically warranted your continued

absence from the workplace.'"  *Id.* ¶ 68.

The defendant argues in its Motion to Dismiss that these counts should be dismissed

under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  Def.'s Mem. at

9-11.  Defendant specifically asserts that nothing in Section 9 of the agreement "limited or

restricted in any manner" Supervisor Barber's statement about plaintiff's service deficiency of

unacceptable attendance.  *Id.* at 11.  Defendant claims, therefore, that plaintiff has not "allege[d]

any facts showing that he had rights under the settlement agreement that were [plausibly]

breached in any manner."  *Id.* at 12.  Alternatively, the defendant moves for summary judgment

on these counts "because assuming the truth of [plaintiff's] allegations, Plaintiff has failed to

show that any reasonable fact finder could find a breach of the settlement agreement, and thus

failed to show a materially adverse employment action, or a materially adverse action."  *Id.*

The plaintiff fails to address defendant's argument for dismissing Counts 5, 13, and 21

for failure to state a claim.  *See generally* Pl.'s Mem. at 29-34.  The counts may be dismissed for

this reason alone.  "It is well understood in this Circuit that when a plaintiff files an opposition to

a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat

those arguments that the plaintiff failed to address as conceded."  *Hopkins v. Women's Div., Gen.

Bd. of Global Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) (citing *FDIC v. Bender*, 127

F.3d 58, 67-68 (D.C. Cir. 1997)); *Day v. D.C. Dep't of Consumer & Regulatory Affairs*, 191 F.

Supp. 2d 154, 159 (D.D.C. 2002) ("If a party fails to counter an argument that the opposing party

makes in a motion, the court may treat that argument as conceded"); *Bancoult v. McNamara*, 227

F. Supp. 2d 144, 149 (D.D.C. 2002) ("if the opposing party files a responsive memorandum, but

fails to address certain arguments made by the moving party, the court may treat those arguments

as conceded, even when the result is dismissal of the entire case").  The Court therefore treats the

defendant's arguments as conceded for these Counts.  In any event, the defendant is correct that

Supervisor Barber's notation regarding the plaintiff's service deficiency is a far cry from

accusing the plaintiff of "wrong-doing."  Indeed, nowhere does the plaintiff allege that the

defendant violated section 9 of the agreement by indicating that the plaintiff was terminated

involuntarily, which might contravene the "spirit" of the paragraph of the Separation Agreement

at issue in Counts 5, 13, and 21.  Thus, the Complaint simply fails to state a claim that the

Settlement Agreement was breached by Supervisor Barber's Statement.

### 2. Hostile Work Environment Allegations (Counts 8, 16, 24)

The Court next turns to the plaintiff's hostile work environment claims.  Counts 8, 16,

and 24 all contain allegations related to the alleged "creation of a supervisory hostile work

environment."  Compl. at 22-23, 32-33, 45-46.  "To determine whether a hostile work

environment exists, the court looks to the totality of the circumstances, including the frequency

of the discriminatory conduct, its severity, its offensiveness, and whether it [interferes] with an

employee's work performance."  *Hunter v. District of Columbia*, 797 F. Supp. 2d 86, 92 (D.D.C.

2011) (quoting *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008)).  In order to

succeed with such a claim, "a plaintiff must show that his employer subjected him to

'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter

the conditions of the victim's employment and create an abusive working environment.'"
*Baloch*, 550 F.3d at 1201.

The plaintiff alleges in his Complaint under the heading of "hostile work environment" that there was a "causal connection between the Plaintiff's ADA qualified disabilities, Plaintiff's medical history, Defendant's regard of Plaintiff as disabled under the ADA pursuant to [plaintiff's physical impairments] and Plaintiff's ADA request for reasonable accommodation by way of his absence from the workplace for thirty days for supervised residential treatment . . . and the pattern of decisions taken by Defendant's decisionmaking agents resulting in the unlawful discriminatory employment practices [set forth in the Complaint]."  Compl. ¶ 118.  The plaintiff argues additionally that he has "[supported]" his hostile work environment allegation with facts such as defendant's denying the plaintiff a copy of the Supervisor's Statement.  Pl.'s Mem. at 31.  The plaintiff's claim fails, however, because, viewing the Complaint in the light most favorable to the plaintiff, the plaintiff does not allege **any** "discriminatory intimidation, ridicule, and insult" much less intimidation, ridicule, and insult that are "sufficiently severe or pervasive to alter the conditions of the victim's employment."  *Baloch*, 550 F.3d at 1201. Nowhere in the Complaint does the plaintiff provide any support for the conclusion that he worked in a "hostile work environment."  Denying the plaintiff a copy of the Supervisor's Statement, without any plausible suggestion that this was a discriminatory act does not suffice to support a hostile work environment claim.

Nor does the denial of disability retirement benefits for the plaintiff constitute a hostile work environment claim.  The plaintiff states that "the initial denial of Plaintiff's application for disability retirement loss was a loss of benefits to the Plaintiff additional to the loss in compensation and health benefits attributable to the "Supervisor's Statement . . . ."  Pl.'s Mem. at

33.  As the Court has already determined, the missing Supervisor's Statement claims must be dismissed under Rule 12(b)(1).  Furthermore, the basis for OPM's denial of benefits was due to the lack of medical documentary support, not Supervisor Barber's Statement.  Any loss of benefits because of OPM's decision seems more appropriately addressed to OPM than to the defendant, who did not make the decision to initially deny the plaintiff disability retirement benefits.   Counts 8, 16, and 24 are therefore dismissed for failure to state a claim.

### 3.  Constructive Discharge from Employment Allegations (Counts 6, 14, 22)

Counts 6, 14, and 22 are all allegations regarding the alleged "constructive discharge of the plaintiff from employment."  Compl. at 19-20, 29-31, 41-43.  "To establish a claim for constructive discharge, a plaintiff must prove that (1) intentional discrimination existed, (2) the employer deliberately made working conditions intolerable, and (3) aggravating factors justified the plaintiff's conclusion that she had no option but to end her employment."  *Ivey v. Fenty*, 789 F. Supp. 2d 65, 71 (D.D.C. 2011).  "Circuit law is clear that a finding of constructive discharge depends on whether the employer deliberately made working conditions intolerable and drove the employee out."  *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1558 (D.C. Cir. 1997).  "The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?"  *Veitch v. England*, 471 F.3d 124, 130 (D.C. Cir. 2006).  The D.C. Circuit has made clear that the "mere existence of workplace discrimination is insufficient to make out a constructive discharge claim; [c]onstructive discharge . . . requires a finding of discrimination and the existence of certain 'aggravating factors.'"  *Id.* (citations and quotation marks omitted).  "'Aggravating factors' are those aspects of a discriminatory work environment that, by making the workplace so disagreeable, prevent the reasonable employee from seeking remediation on the job."  *Id.*

(citation omitted); *see also Dashnaw v. Pena*, 12 F.3d 1112, 1115 (D.C. Cir. 1994) ("in order to find constructive discharge in a case involving a claim of discrimination, a District Court must find not only intentional discrimination, but also 'aggravating factors.'").

Viewing the Complaint in the light most favorable to the plaintiff, the "[p]laintiff has failed to allege facts that 'plausibly give rise to an entitlement to relief' for constructive discharge." *Ivey*, 789 F. Supp. 2d at 72 (quoting *Iqbal*, 129 S. Ct. at 1949-50). First, the plaintiff has not plausibly alleged that there was any "intentional discrimination" towards the defendant. Second, there is simply no allegation that working conditions were in any way "intolerable" for the plaintiff, nor any facts alleged at all about the plaintiff's working conditions. *Veitch*, 471 F.3d at 130. The Settlement Agreement that led to the plaintiff's separation from employment came about because plaintiff's supervisor proposed his removal for "failure to follow leave procedures, absences without authorized leave . . ., inappropriate behavior, sleeping during duty hours, disappearance during duty hours and failure to follow the direct order of a supervisor." Compl. ¶ 22. There is no plausible claim from the plaintiff that intolerable working conditions led to the plaintiff's separation from employment. Finally, the plaintiff has alleged no "aggravating factors" leading to his resignation. The plaintiff resigned as a term of a Settlement Agreement that came about because of the plaintiff's performance of his work duties, not because of any aggravating factors. Therefore, the plaintiff's claims for constructive discharge must be dismissed for failure to state a claim.

### 4.    Misrepresentations to Congressman Allegations (Counts 4, 12, 20)

Counts 4, 12, and 20 all relate to allegations of "Acting Architect Ayers's Misrepresentations to Congressman Hoyer respecting the 'oversight' and delay in submitting plaintiff's application for disability retirement." Compl. at 16-18, 27-28, 38-40. As noted, in

February 2010, Architect Ayer responded by letter to Congressman Hoyer's inquiry about the status of the plaintiff's application.  Architect Ayer explained in the letter, *inter alia*, that the plaintiff's application "package was processed and forwarded to the [NFC] on February 27, 2009." *Id.* ¶ 70.  Architect Ayer noted that "Mr. Bradshaw's voluntary resignation was processed before his application for disability retirement was adjudicated by [OPM]." *Id.* ¶ 71. "[T]his discrepancy," the letter stated, "caused a delay in processing at NFC.  As a result, OPM did not receive Mr. Bradshaw's application from NFC until September 16, 2009." *Id.* ¶ 72.

The defendant argues that these claims must be dismissed under Rule 12(b)(6) because the plaintiff "has failed to make any factual allegations . . . which plausibly give rise to an entitlement to relief."  Def.'s Mem. at 16.  Defendant argues furthermore that the "February 4, 2010 letter, written **after** OPM had denied Plaintiff's application, could not have interfered with the application.  Thus, his factual allegations do not plausibly give rise to entitlement to relief." *Id.*  The Court agrees.

Viewing the Complaint in the light most favorable to the plaintiff, the plaintiff has not stated a plausible claim for relief for the alleged "misrepresentations" in Architect Ayer's letter to Congressman Hoyer.  First of all, is not clear from the Complaint or the plaintiff's brief what the plaintiff believes were the "misrepresentations" in this letter from Architect Ayer.  To the extent that the plaintiff is perhaps alleging that the "discrepancy" at issue in the letter was not an "oversight" but was intentional, the plaintiff has stated no plausible allegations to support this proposition.  Second, the letter seems to have had no negative repercussions for the plaintiff. The contents of the letter did not impact the plaintiff's employment and there are no allegations that the letter influenced OPM's decision about plaintiff's disability retirement application. Third, the letter was to a Congressman, and not to OPM, the entity that initially denied the

plaintiff's allegation.  The plaintiff has put forth no plausible allegations that the letter was of any consequence to him.  The plaintiff's claims must therefore be dismissed under Rule 12(b)(6) for failure to state a claim for which relief can be granted.

## IV.    CONCLUSION

For the reasons explained below, 12 counts of the the plaintiff's Complaint are dismissed under Rule 12(b)(1) (Counts 1, 2, 3, 7, 9, 10, 11, 15, 17, 18, 19, and 23), and 12 counts are dismissed under Rule 12(b)(6) (Counts 4, 5, 6, 8, 12, 13, 14, 16, 20, 21, 22, and 24).  Since all counts of the Complaint are dismissed, the case as a whole must be dismissed.  An Order consistent with this Opinion shall be issued.


**DATED: April 20, 2012**

/s/ *Beryl A. Howell*
BERYL A. HOWELL
United States District Judge